UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

ROGER J. LIANOZ,

            Plaintiff,

    v.

HOSPICE OF HUMBOLDT,

            Defendant.

Case No.  12-cv-04349-NJV

**ORDER (1) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; (2) REFERRING MATTER TO ADR DEPARTMENT; AND (3) SCHEDULING FURTHER CMC**

Re: Dkt. No. 23

# INTRODUCTION

Plaintiff Roger Lianoz worked as a registered nurse for defendant Hospice of Humboldt ("Hospice") from 2007 to 2008.  On one occasion, while Lianoz worked in a team with a male home health aide, Lianoz alleges that a Case Manager asked him to switch teams because she "just d[idn't] like the idea of two men working together."  Lianoz refused, contending that the request was discriminatory.  The case manager, Suzan Jernigan, subsequently was promoted to Interim Director of Nurses, thereby becoming Lianoz's supervisor.  Lianoz alleges that Jernigan then embarked on a campaign of retaliation, singling Lianoz out for discipline, and treating him differently than other employees who were similarly situated.  Jernigan terminated Lianoz in October 2008.  Lianoz pursued a wrongful termination action before the Equal Employment Opportunity Commission and subsequently filed this lawsuit.  He asserts a discrimination claim and a retaliation claim under Title VII of the Civil Rights Act of 1964, which prohibits employers from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e.

United States District Court
Northern District of California

1    Hospice has filed a motion for summary judgment, arguing that no triable issue of material

2    fact exists as to Lianoz's civil rights claims.  The motion was fully briefed and came on for

3    hearing on July 1, 2014.  For the reasons stated below, the court will deny Hospice's motion for

4    summary judgment.

5                        **JURISDICTION AND VENUE**

6    This court has original federal question jurisdiction over actions brought under the Civil

7    Rights Act of 1964.  *See* 28 U.S.C. § 1331.  All parties have consented to the jurisdiction of this

8    court pursuant to 28 U.S.C. § 636(c).  *See* Doc. Nos. 5 & 7.  Venue is proper in this district

9    because the events giving rise to the claims occurred in Humboldt County, which is located in the

10   Northern District of California, Eureka Division.  *See* 28 U.S.C. §§ 84, 1391(b).

11               **LEGAL STANDARDS ON SUMMARY JUDGMENT**

12   A court "shall" grant summary judgment when the pleadings, discovery, and evidence

13   show that there is "no genuine issue as to any material fact and the movant is entitled to judgment

14   as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it could affect the outcome of the

15   action, and a dispute about a material fact is "genuine" "if the evidence is such that a reasonable

16   jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S.

17   242, 248 (1986).

18   The moving party bears both the initial burden of production as well as the ultimate burden

19   of persuasion to demonstrate that no genuine dispute of material fact exists.  *Nissan Fire &*

20   *Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000).  Once the moving

21   party meets its initial burden, the nonmoving party is required "to go beyond the pleadings and by

22   [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file,

23   designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*,

24   477 U.S. 317, 324 (1986) (internal quotations and citations omitted); *see also* Fed. R. Civ. P.

25   56(c)(1).  Courts considering summary judgment motions are required to view the evidence in the

26   light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

27   *Corp*., 475 U.S. 574, 587 (1986).  If a reasonable jury could return a verdict in favor of the

28   nonmoving party, summary judgment is inappropriate.  *Liberty Lobby*, 477 U.S. at 248.

United States District Court
Northern District of California

2

United States District Court
Northern District of California

District courts in the Ninth Circuit must be cautious in granting summary judgment for employers on discrimination claims. *See Lam v. University of Hawai'i*, 40 F.3d 1551, 1564 (9th Cir. 1994) ("We require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry-- one that is most appropriately conducted by the factfinder") (internal quotations and citation omitted).

## EVIDENTIARY OBJECTIONS

Both parties have filed evidentiary objections. *See* Doc. Nos. 52, 73, 75. Except as material to the court's decision, as specifically discussed below, the court overrules all evidentiary objections for purposes of summary judgment only, and without prejudice to the parties raising these objections at trial.

## UNDISPUTED MATERIAL FACTS

Lianoz started working at Hospice in July 2007 as a *per diem* registered nurse ("RN"). Sharon Hunter, the Director of Nurses at Hospice, hired and supervised Lianoz. In December 2007, Hunter gave Lianoz a positive three-month evaluation: "Overall, Roger has been an essential member of our per diem team… Roger has high expectations of himself and because of this helps to bring all of us up to a professional level. He has solid critical thinking/autonomous decision-making skills and is caring and compassionate." Doc. No. 25, Ex. C. Lianoz also received positive comments from the families of a number of his patients. Doc. No. 33, Ex. B. On April 27, 2008, Lianoz became a permanent "visiting" RN on the Hospice "Facilities Team." Deposition of R. Lianoz ("Lianoz Dep.") at 89:4-18. Lianoz continued to be supervised by Hunter. Hunter counseled Lianoz in January 2008 after hearing that a patient had complained that Lianoz was not professionally groomed and dressed during a visit, and that he had smelled of alcohol. Doc. No. 23-6 (Hunter Decl.) ¶ 7 & Ex. A ("The daughter of [a patient stated that Lianoz] smelled of stale alcohol, was unkempt and his appearance was not professional and did not represent hospice well. She hopes he will not return to the house"). In June 2008, Hunter counseled Lianoz "on his repeated tardiness." *Id*. ¶ 10 & Ex. C (July 1, 2008 note documenting counseling: "Earlier this month, Roger and I met to discuss repeated late arrivals to work, which

3

was affecting the Facilities Team dynamic and simply unacceptable from a work accountability standpoint"). Lianoz explained to Hunter that he was not late because he had started work from home by listening to lengthy voice mail reports; he also acknowledged that he had been late one week because he had trouble coordinating childcare; they discussed a later start time for him. Lianoz Dep. at 149:1-151:6. Hunter also learned that Lianoz had used inappropriate language with another employee, Charity Punch, and counseled him on that point; Lianoz acknowledged using the inappropriate language and apologized to Punch. *Id.* ¶ 9; *see also* Lianoz Dep. at 196:13-18; Doc. No. 23-2 (Punch Decl.) ¶ 12. Lianoz also failed to attend work on June 27, 2008 for mandatory training. Doc. No. 23-6 ¶ 11; *see also* Lianoz Dep. at 148:15-22. On July 8, 2008, Hunter counseled Lianoz because he worked unapproved overtime. *Id.* ¶ 12 & Ex. D. "Counseling" did not constitute a "write up" and did not entail any disciplinary consequences. Lianoz Dep. at 146:2-147:8; Jernigan Decl. ¶ 42.

When he joined the Facilities Team in April 2008, Lianoz was paired with a male home health aide ("HHA"), Eric Bach. Lianoz Dep. at 92:3-17. Lianoz testified that in or around May 2008, Suzan Jernigan asked him whether he "would consider" being paired with a female HHA instead of Bach. Lianoz Dep. at 95:18-97:3 (Jernigan "asked me if I would consider switching teams from working with Eric and work with Charity," a female HHA). Lianoz testified that he asked Jernigan whether her inquiry was based on a patient's request, and that Jernigan explained that it was not, but that she "just didn't like the idea of two men working together." *Id.* at 96:16-97:3. Patients may request health care providers of a particular sex for a number of reasons, and Lianoz acknowledged that the "privacy and comfort" of certain female patients were valid reasons for not assigning them male health care providers. *Id.* at 97:4-98:5.[1] Because Jernigan's inquiry was not based on a patient request, however, Lianoz objected. Lianoz responded that he "was still

---

[1] *See also* Doc. No. 23-2 (Punch Decl.) ¶ 4 ("I recall some instances where family members would ask that two males not be assigned to treat their parent. . . I also recall other times where someone would say something to the effect [of], 'Hey, my Dad does better with two men'"); Doc. No. 23-6 (Hunter Decl.) ¶ 5 (some "patients, especially elderly patients, expressed an interest to have their care performed by a nurse o[r] home health aide of the same sex. If possible, these requests would be accommodated"); Doc. No. 23-10 (Bach Decl.) ¶ 9 ("Quite frequently . . . a female patient or a family member of a female patient would request not to have two males assigned to provide care").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    a nurse" and that he "didn't believe my work assignment should [] be changed simply because I

2    was a man." Lianoz Dep. at 98:12-20.  Lianoz further testified that Jernigan became "tense,

3    irritable, [and] angry" when he declined, and told him he might "want to reconsider" his answer.

4    *Id*. at 100:1-9.  Lianoz "declined the option that she gave me of her request to switch work

5    assignments." *Id*. at 100:13-22.

6           Lianoz testified that Punch and Laurel Davidsen overheard his discussion with Jernigan.

7    *Id*. at 74:13-24.  Davidsen testified that she recalled being present when Jernigan asked Lianoz to

8    switch teams: "Suzan just asked Roger if he could be paired with a female home health aide or the

9    home health aide could be paired with a female nurse, so that way there's not two males taking

10   care of a female patient.  I'm not sure if that was Hospice's practice or not.  I don't think it was.  I

11   think the only time that Hospice . . . if a patient recommended not to have two male health care

12   people come at the same time, then we did everything we could to oblige them."  Davidsen Dep. at

13   13:6-14:7; *see also id*. at 34:18-35:10 ("I heard her say that she [doesn't] like two men to be taking

14   care of a female patient.  If she can help it, it would be more comfortable for the patient if they

15   could have a female . . . I think she was just talking about in general").  Punch has no recollection

16   of hearing this discussion and denies ever hearing Jernigan tell Lianoz that she didn't like the idea

17   of two men working together.  Doc. No. 23-2 ¶¶ 2-3.  Bach, whom Lianoz testified was present in

18   the room during this discussion, declares he did not hear this exchange.  Doc. No. 23-10 ¶ 7.

19   Jernigan does not recall having this discussion with Lianoz, or asking him to switch teams.  Doc.

20   No. 38 at 35:8-24.  If she did ask him, however "it was for either a request for a female aide or it

21   was due to efficiency.  For example, if there was already an aide working at one facility, it would

22   make more sense, [be] more efficient, to keep that aide at that facility."  *Id*. at 28:18-23.

23          After declining to switch teams, Lianoz continued working with Bach "from then forward"

24   and also worked with at least one other man.  Lianoz Dep. at 100:23-101:7.  Jernigan never again

25   asked Lianoz to switch teams.  *Id*. at 101:10-13.  Lianoz is not aware of any other instance where

26   two men were not allowed to work together at Hospice, or of a request being made that two men

27   not be allowed to work together.  *Id*. at 109:25-112:20.  In fact, Bach declares that he has been

28   assigned to numerous all-male care teams and that he is unaware of any effort by Hospice to

                                                    5

1    prevent two males from providing care together.  Doc. No. 23-10 (Bach Decl.) ¶ 6.

2         At the time of the May 2008 conversation with Lianoz, Jernigan was a Case Manager.  In

3    addition to caring for her own patients, her duties included assigning nurses and HHAs to new

4    patients.  Doc. No. 26 (Jernigan Decl.) ¶ 7; *see also* Doc. No. 38 (Jernigan Dep.) at 14:21-15:7.

5    Although she did not directly supervise any of the RNs in her team, all team members were

6    expected to report to her if they were going to be tardy or absent so that she could reallocate staff

7    per her duties as a Case Manager.  Doc. No. 26 (Jernigan Decl.) ¶ 7-9; Doc. No. 38 (Jernigan

8    Dep.) at 14:18-20 & 19:5-7; *cf*. Lianoz Dep. at 91:3-10 (Lianoz worked "under" Jernigan because

9    he was assigned to the team for which she was Case Manager).  Jernigan observed Lianoz arriving

10   late to work "on what I felt to be a regular basis."  Doc. No. 26 ¶ 9; *see also* Doc. No. 38 at 20:23-

11   25:4 (observed Lianoz coming in late, without warning or explanation).  Jernigan tracked Lianoz's

12   tardiness.  *Id*. ¶ 10.  While Lianoz had told Hunter that he was not late (having in fact started work

13   from home, *see supra*), there is no evidence that he explained this to Jernigan or that Hunter

14   communicated this to Jernigan.  *See, e.g.*, Doc. No. 38 at 21:1-21 & 25:2-5 (Lianoz never checked

15   in with Jernigan; she never asked why he was late).

16        Jernigan left for a three week vacation to Disneyworld.  Upon her return, she gave souvenir

17   Disneyworld pins to Punch and Davidsen, and to her good friend, Noggle.  Jernigan did not give a

18   souvenir pin to Lianoz, or to the other members of the Facilities Team.  *See* Doc. No. 70-5 ¶ 2;

19   Jernigan Dep. at 32:32:3-6 (more than ten people on the Facilities Team).  Lianoz erroneously

20   believed that Jernigan had given pins out to more people, and felt singled out and rejected by

21   Jernigan.[2]

22        In July 17, 2008, Hunter left Hospice and Jernigan became the Interim Director of Nurses

23

24        [2]  Indeed, Lianoz contends his retaliation claim is supported by this incident.  Lianoz Dep.
25   at 83:1-84:19; *see also* Doc. No. 31 at 22-23 (Disneyworld pin incident is evidence of Jernigan's
     animus, "singling him out as the only member of her team not to receive a Disney World pin," and
26   characterizes it as Jernigan's "first retaliatory act").  The court sustains Hospice's evidentiary
     objection, finding that Lianoz's statements regarding the Disneyworld pin incident are not based
27   on personal knowledge and lack foundation.  Given Jernigan's declaration, which is based on
     personal knowledge, the Disneyworld pin incident does not support Lianoz's argument that
28   Jernigan singled him out and "retaliated" against him.  It only establishes that Jernigan brought
     home souvenirs for three co-workers whom she liked.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    ("IDON").  Doc. No. 26 (Jernigan Decl.) ¶¶ 5-6.  Jernigan became Lianoz's direct supervisor.  *Id.*

2    ¶ 6.  For the following three months, Jernigan counseled Lianoz for numerous performance issues.

3    Lianoz declares that the vast majority of the counseling was unwarranted, and that Jernigan

4    wrongfully blamed him for the mistakes of others.  *See generally* Doc. No. 33; *see also* Lianoz

5    Dep.  For purposes of summary judgment, the court must construe the facts in the light most

6    favorable to the non-moving party and accept Lianoz's version of these facts where he offers any

7    evidence to support them.  Accordingly, there exist triable issues of fact as to whether Lianoz was

8    counseled for a number of incidents that were not his fault; whether he was subjected to more

9    oversight, counseling and/or "writing up" than other caregivers at Hospice; and if so, whether this

10   greater scrutiny was warranted or was animated by discriminatory and/or retaliatory motives.  *See*

11   Doc. No. 33 ¶¶ 9-13, 15-17, 22, 27-32 (Patient #7635), 33 (Patient #7806), 34 (Patient #7749), 35

12   (Patient #7802), 41 (Patient #7711).

13        Nevertheless, it is undisputed that the following incidents did take place:

14        (1) In July 2008, Jernigan was with Punch when Punch received a call from Lianoz.

15             Punch became "visibly upset and said he had been rude and said some swear words."

16             Doc. No. 38 at 20:2-19; Doc. No. 23-2 (Punch Decl. ¶¶ 11-13 & 22).  The next day,

17             Punch approached Jernigan and stated that Lianoz had treated her rudely and

18             complained of his attitude.  Punch Decl. ¶ 14.  Lianoz contends that he had been

19             "joking" and "meant no harm" by his comment; he also admits noticing that Punch

20             "mistook my statement for rudeness."  Doc. No. 33 ¶ 20.

21        (2) Also in July 2008, Jernigan counseled Lianoz for failing to change the dressing wounds

22             of Patient #7608.  Lianoz contends that he did not work on two of the four days that the

23             dressings were not changed.  Be that as it may, his own expert declares that Lianoz

24             "failed to make the regular dressing changes as per the physician's orders."  Waluk

25             Decl. ¶ 7.[3]

26

27        _____

28        [3] Lianoz also contends that Wheeler also failed to change the dressings and was not
     disciplined, but he lacks foundation for that statement.  The court sustains Hospice's objection to
     that evidence.

United States District Court
Northern District of California

(3) Jernigan prepared two Performance Improvement Plans for Lianoz.  The first (dated July 18, 2008) addressed what Jernigan described as "habitual tardiness."  Doc. No. 26 ¶ 15.  The second (dated July 23, 2008) addressed four areas of responsibility: (a) ensuring patient safety; (b) ensuring regular dressing changes; (c) treating other employees respectfully; and (d) being a team player.  *Id.* ¶ 20.  Lianoz successfully completed both Performance Improvement Plans.  *Id.* ¶ 14.  He completed the second plan in September 2008.  *Id.*

(4) On August 1, 2008, Lianoz concedes that he missed a mandatory meeting.  Doc. No. 33 ¶ 23.

(5) A nurse complained to Jernigan that Patient #7618 was not getting regular dressing changes and the patient had malodorous drainage from one of his wounds.  Doc. No. 26 ¶ 18.  Lianoz was responsible for that patient's care.  *Id.*  Jernigan counseled Lianoz, who indicated that he had not changed the dressing because he had been busy with other patients.  *Id.* & Ex. D; *see also* Doc. No. 23-5 (Simone Decl.) ¶ 7 & Ex. B.  In his opposition to the motion for summary judgment, Lianoz does not argue (much less provide any admissible evidence[4]) that a triable issue of fact exists regarding this incident.

(6) Between July 29, 2008 and August 11, 2008, Lianoz "requested additional support and assistance with [] organizing my day and [] completing required assignments."  Lianoz Dep. at 210:5-211:16.  Lianoz had "no idea why Suzan Jernigan was disciplining me the way that she was.  And I was willing to do whatever kind of training or updating I

---

[4] Lianoz does not address patient #7618 in his opposition or in his declaration.  However, Lianoz's expert, Kindra Waluk, declares that Lianoz was not the only nurse who provided wound care for patient #7618.  *See* Doc. No. 47 ¶ 6.  As an initial matter, the fact that another nurse provided care does not create a triable issue of fact whether providing this care was Lianoz's responsibility, or whether he failed to provide that care.  Moreover, Waluk admits that she did not review the full set of documentation relevant to this patient, and in her deposition, admitted that she had not formed an opinion regarding this patient.  *Id.*; *see also* Waluk Dep. at 27:11-13.  Therefore, to the extent that Lianoz relies on Waluk's opinion regarding patient #7618 and that the opinion is relevant, the court sustains Hospice's objection to Paragraph 6 of Waluk's Declaration (Doc. No. 73 at 14).  The opinion lacks foundation, is based on insufficient facts, and is contrary to Waluk's deposition testimony.

1    needed to do to get her off my back.  I wanted to be a good employee.  I didn't want to

2    be repeatedly disciplined by her."  *Id*. at 211:5-10.  Jernigan arranged to provide

3    Lianoz with the training he requested.  *Id*. at 211:11-14.

4    (7)  On October 15, 2008, Lianoz instructed HHA Maryhelen Ness to remove the catheter

5    from patient #7929.  Ness had called Lianoz to explain that the patient's catheter was

6    leaking and the patient was experiencing severe pain.  Lianoz could not visit the patient

7    because he was discharging another patient, a process that can take several hours.  He

8    "was aware that Ms. Ness was not licensed" to remove the catheter.  Doc. No. 33 ¶ 37.

9    Given the patient's level of pain, Lianoz believed the situation was an emergency, and

10   that there was no time for him to find another nurse to perform the removal.  *Id*.  Ness

11   removed the catheter.  Doc. No. 23-11 (Ness Decl.) ¶ 6 ("I was not licensed to perform

12   this procedure but because I had performed the procedure during my previous

13   employment, I complied with Roger Lianoz's request").  Jernigan discovered the

14   incident and counseled both Lianoz and Ness.  Doc. No. 70-3 (Supp. Ness Decl.) ¶¶ 4-

15   5 & Ex. A; Doc. No. 33 ¶ 37 & Ex. H ("In a black and white analysis of the allegation,

16   yes, I did instruct M. Ness HHA to remove a patient's catheter.  However, there were

17   significant mitigating factors behind my decision to instruct her to do so").  Lianoz

18   argues that his conduct was appropriate from a moral and ethical standpoint, helped the

19   patient, and did not violate law; he does not argue (nor provide any evidence) that his

20   conduct was in accordance with Hospice policy or practice.  Lianoz was terminated 11

21   days later, and Lianoz acknowledges that this incident was cited "as an important

22   reason for my termination."  Doc. No. 33 ¶ 40.

23   (8)  On October 20, 2008, RN West met with Jernigan to complain about Lianoz and his

24   failure to complete dressing changes several days earlier.  Doc. No. 26 ¶ 40 (discussing

25   patient #7926).  In his opposition to the motion for summary judgment, Lianoz does

26   not argue (much less provide any evidence) that a triable issue of fact exists regarding

27   this incident.

28   (9)  Punch complained about Lianoz to Jernigan.  *See* Doc. No. 23-2 (Punch Decl.) ¶ 13 ("I

United States District Court
Northern District of California

9

complained to Suzan Jernigan that [Lianoz] was overbearing and rude") & ¶ 14 ("I also

recall telling Suzan Jernigan [that] 'It's terrible being here with him, he has such a

negative attitude'").

(10)     Other employees submitted declarations in support of Defendant's motion for

summary judgment.  The court sustains Lianoz's objections to these declarations to the

extent they are offered to prove the truth of the matter asserted therein, but overrules

the objections to the extent the declarations establish the declarants' impressions of

their co-worker's performance and relationship with Jernigan.  *See* Doc. No. 23-9

(Wheeler Decl.) ¶ 9 ("I recall that Roger Lianoz had a difficult time managing his

workload at Hospice[.]  I recall being asked by the administration . . . to help Mr.

Lianoz organize his time in a more efficient manner") & ¶ 10 (on one occasion, Lianoz

"failed to provide assistance to other nurses, including me, on a day in which he saw

only one patient"); Doc. No. 23-10 (Bach Decl.) ¶ 4 ("After working with Roger

Lianoz for some time, it became apparent to me that Roger Lianoz lacked enthusiasm,

motivation and compassion.  I recall questioning Mr. Lianoz's professionalism and

bedside manner").

(11)     Jernigan counseled Lianoz more than any other employee during her 3.5-month

tenure as IDON, but she counseled others.  Doc. No. 38 at 74:9-76:12 (could not recall

exactly how many other employees she counseled, but estimates it was more than one

and less than five); Doc. No. 26 ¶ 6 (was IDON from July 17, 2008 until November 3,

2008).  Lianoz never moved to compel access to the confidential and privileged

employment records of these employees and thus, they were not produced.  *See* Doc.

No. 71 (Request for Judicial Notice).  Jernigan "thought there were a lot of incidents

that came up" with Lianoz.  Doc. No. 38 at 7:7-12.

By October 21, 2008, Jernigan and Christy Burton (the Director of Human Resources and

Compliance (Burton Dep. at 11:3-5)) concluded that "Lianoz was not meeting up to the standards

of Hospice [], that he had been given a fair opportunity to improve his job performance and

because of his below standard of work performance in many areas, he should be terminated."

1   Doc. No. 26 ¶ 41; Doc. No. 38 at 85:7-12 ("there were several issues that just continued, even

2   after the performance improvement plans, and it just kept building.  It was just a series of issues").

3   That day, Jernigan and Burton met with Lianoz and terminated him.  Doc. No. 26 ¶ 41 & Ex. Z;

4   Doc. No. 38 at 105:3-17 (Lianoz was told he was terminated for his job performance).

5                                        **DISCUSSION**

6   **I.  DISPARATE TREATMENT CLAIM**

7           Disparate treatment occurs where an employer has treated a
        particular person less favorably than others because of a protected
8       trait. A disparate-treatment plaintiff must establish that the
        defendant had a discriminatory intent or motive for taking a job-
9       related action. A discriminatory motive may be established by the
        employer's informal decision-making or a formal, facially
10      discriminatory policy, but liability depends on whether the protected
        trait . . . actually motivated the employer's decision.  It is
11      insufficient for a plaintiff alleging discrimination under the disparate
        treatment theory to show the employer was merely aware of the
12      adverse consequences the policy would have on a protected group.

13  *Wood v. City of San Diego*, 678 F.3d 1075, 1081 (9th Cir. 2012) (internal citations and quotation

14  marks omitted).

15          To prove a disparate treatment claim under Title VII, a plaintiff may use the burden-

16  shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973);

17  alternatively, he may offer direct or circumstantial evidence demonstrating that a discriminatory

18  reason more likely than not motivated his employer.  *See Metoyer v. Chassman*, 504 F.3d 919, 931

19  (9th Cir. 2007) (citing *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)).

20  Lianoz has established a triable issue of fact exists under both approaches.

21      **A.  *McDonnell Douglas* burden-shifting analysis**

22          At step one of the *McDonnell Douglas* burden-shifting analysis, a plaintiff alleging

23  disparate treatment first must establish a prima facie case of discrimination.  *McDonnell Douglas*,

24  411 U.S. at 802.  If the plaintiff makes a prima facie case, the burden shifts to his employer "to

25  articulate a legitimate, nondiscriminatory reason for its alleged discriminatory conduct."  *Vasquez*

26  *v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2004).  If the employer offers such a reason,

27  the burden shifts once more to the plaintiff, who must then show that the reason advanced by the

28

United States District Court
Northern District of California

11

employer is a pretext for unlawful discrimination.  *Id*.  While the burden of production may shift at each step of this analysis, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  Hospice does not challenge whether Lianoz made his prima facie case of discrimination.  *See* Doc. Nos. 23, 70.  The court therefore will proceed to Steps Two and Three of the *McDonnell Douglas* analysis.

### 1.  Legitimate, non-discriminatory reason for counseling, "writing up," and eventually terminating Lianoz

The undisputed material facts establish that when she was DON, Hunter counseled Lianoz on several issues, including tardiness, failure to attend scheduled training, inappropriate conduct with a co-worker, and unapproved overtime.  The undisputed facts also establish that Jernigan had observed Lianoz's late arrivals, but was not aware of Lianoz's explanation that he had begun working from home and therefore was not actually late.  After Jernigan was promoted to IDON, the undisputed facts establish that Lianoz was involved in a number of incidents that Lianoz concedes actually happened: specifically, Lianoz concedes the underlying material facts described above with respect to patients #7618, #7926, and #7929.  In addition, the undisputed facts establish that Nurse West and LVN Amanda complained to Jernigan that Lianoz was not properly caring for patients #7618 and #7926.  It is also undisputed that Lianoz failed to attend a mandatory meeting.  Jernigan testified that she counseled Lianoz more than any other employee during her 3.5 month tenure as IDON, and that even after Lianoz successfully completed the two Performance Improvement Plans, Lianoz continued to make mistakes.  After consulting with HR Director Burton, Jernigan terminated Lianoz for performance problems.

Hospice has met its burden by articulating legitimate, non-discriminatory reasons for counseling and eventually terminating Lianoz: tardiness, missed meetings, problems with co-workers, and patient safety issues.

### 2.  Evidence of pretext

Lianoz may show pretext either by (1) showing that unlawful discrimination more likely than not motivated the employer, or (2) by showing that the proffered explanation is "unworthy of

12

credence because it is inconsistent or otherwise not believable." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005) (citation omitted).  Direct evidence of pretext is evidence "which, if believed, proves the fact of [discriminatory animus] without inference or presumption." *Coghlan v. Am. Seafoods Co*., 413 F.3d 1090, 1095 (9th Cir. 2005) (quoting *Godwin v. Hunt Wesson Inc*., 150 F.3d 1217, 1222 (9th Cir. 1998)).  This "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Id*.  "To establish pretext under step three, very little direct evidence of discriminatory motive is required, but if circumstantial evidence is offered, such evidence has to be 'specific' and 'substantial.'" *Reyes v. SFUSD*, 2012 U.S. Dist. LEXIS 134991, *19 (N.D. Cal. Sept. 20, 2012) (quoting *Godwin*, 150 F.3d at 1222); *see also Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1028 n.6 (9th Cir. 2006) (merely denying the credibility of defendant's proffered reason for the challenged employment action or relying solely on plaintiff's subjective beliefs that the action was unnecessary is insufficient to show pretext).

Lianoz argues that Jernigan's May 2008 comment that she does not like two men working together and her subsequent treatment of Lianoz constitutes evidence that Hospice's reasons for terminating him were pretextual.  He also argues that the fact that similarly situated female caregivers were not counseled for the same types of incidents constitutes circumstantial evidence of pretext.  The court addresses each argument in turn.

### a.   Jernigan's May 2008 Comment

Hospice argues that there was a five-month gap between Jernigan's comments and the adverse employment action that occurred when Lianoz was terminated, and that the comment therefore is nothing more than a "stray remark" that does not constitute evidence of discrimination.  *See, e.g., Moore v. Avon Products, Inc*., 2007 U.S. Dist. LEXIS 74248, *19-*21 (N.D. Cal. Oct. 4, 2007) (comments made years before plaintiff's discharge to persons other than plaintiff that "women make better district and division managers;" that certain management positions were "jobs for women," and that defendant wanted "women-run divisions" did not demonstrate any particular animus towards men, but could be construed as observations that a woman might be better suited than a man to sell cosmetics); *Nesbit v. Pepsico, Inc*., 994 F.2d 703,

13

1    705 (9th Cir. 1993) (statement that defendant "didn't necessarily like gray hair" was ambivalent

2    and not tied to termination, constituting "at best weak circumstantial evidence of discriminatory

3    animus" and statement that "we don't want a unpromotable fifty-year-olds around" was stray

4    remarks that was not tied to employment decisions; neither supported inference of discrimination);

5    *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990) (comment that candidate was

6    hired because "he was 'a bright, intelligent, knowledgeable young man'" was a stray remark that

7    did not create triable issue of fact in age discrimination case); *Coleman v. Quaker Oats Co*., 232

8    F.3d 1271, 1284-85 (9th Cir. 2000) (use of word "promotable," which plaintiff argued was

9    euphemism for "young," did not support inference of discriminatory intent).

10          Here, however, there exists a triable issue of fact regarding whether Jernigan's comment --

11   and Lianoz's refusal to comply with her request -- was followed by adverse employment actions in

12   the form of increased scrutiny of Lianoz's performance; refusal to acknowledge Lianoz's

13   explanations and/or excuses for perceived problematic conduct; repeated "writing up" and/or

14   "counseling" of Lianoz; and, eventual termination of Lianoz after he successfully completed two

15   Performance Improvement Plans.  While Lianoz was not terminated for approximately five

16   months after Jernigan's comment, he has offered some evidence that he was subjected to greater

17   oversight than his colleagues as soon as Jernigan became IDON, and that she counseled or "wrote

18   him up" more frequently than any of his other colleagues.  Although no counseling session in and

19   of itself was connected to any particular adverse employment action, Lianoz argues that the

20   stricter scrutiny that was applied to him (as documented by the number of write ups) was in itself

21   an adverse employment action by making his continued employment extremely stressful and

22   difficult.  The increased scrutiny began soon after Jernigan's remark.  A trier of fact will have to

23   determine whether the write ups that Lianoz argues were not merited were pretextual, or were

24   warranted by his conduct, and whether they constitute adverse employment action.  At this point

25   the court must construe the evidence in the light most favorable to Lianoz.

26          Lianoz has offered sufficient evidence to create a triable issue as to whether Hospice's

27   proffered reasons for terminating him were pretextual.  When taken into the context of subsequent

28   actions by Jernigan, a reasonable trier of fact could find that Jernigan's statement constitutes

United States District Court
Northern District of California

14

United States District Court
Northern District of California

evidence of discrimination.   The court therefore must deny Hospice's motion for summary judgment on Lianoz's disparate treatment claim.   As the court noted during oral argument, Hospice has offered strong evidence that Lianoz was terminated for legitimate, non-discriminatory reasons.   Indeed, the undisputed material facts listed above substantiate Hospice's argument that Lianoz violated standards of care and Hospice policies on a number of occasions.   For purposes of summary judgment, however, the court must consider the "very little evidence" Lianoz offered in the light most favorable to him as the non-moving party, and find it sufficient to allow the case to go forward.   *See Lam*, 40 F.3d at 1564; *see also Lowe v. Monrovia*, 775 F.2d 998, 1008-09 (9th Cir. 1985) ("Once a prima facie case is established either by the introduction of actual evidence or reliance on the *McDonnell Douglas* presumption, summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the elusive factual question of intentional discrimination") (internal citation and quotation omitted) (amended in 1986 to clarify that these principles "do not prevent the summary disposition of meritless suits but simply ensure that when a genuine issue of material fact exists a civil rights litigant will not be denied a trial on the merits."  784 F.2d 1407).

### b.  Similarly situated employees

Lianoz argues that circumstantial evidence of disparate treatment exists in that female employees were not held to the same standard or counseled for the same infractions for which he was counseled.  *See* Doc. No. 31 at 6, 11-15, 21-22.  As an initial matter, Lianoz has not offered any admissible evidence on this point.  The court sustains Hospice's objections to Lianoz's statements in his declaration that female employees were not disciplined for infractions as inadmissible hearsay and lacking foundation.  *See* Lianoz Decl. ¶¶ 24-26, 30, 32-35.  Lianoz chose not to move to compel production of the files of other employees even though he recognized that those files were central to proving his disparate treatment claim.  *See* Jernigan Dep. at 39:25-40:11 ("[W]e're entitled to get into the issue of, you know, whether he was treated differently than others.  So obviously I'm going to need that information").  Lianoz also offered no evidence that other care workers at Hospice had the same lengthy history of problems, counseling, and employee complaints.  Thus, he has failed to offer any evidence that any "similarly situated"

1    employees were treated differently than he was treated.

2         Nor did Jernigan testify that she had not disciplined any employees. *See* Doc. No. 31 at

3    11-15.  The deposition transcript Lianoz briefly quotes actually makes clear that Jernigan testified

4    that she did not *recall* disciplining other employees; it also makes clear that Plaintiff's counsel

5    refused to accede to Jernigan's request to review documents that might refresh her recollection

6    regarding events that had occurred more than four years earlier. *See, e.g.,* Jernigan Dep. at 52:11-

7    56:3, 60:4-17, 75:4-22, 87:1-16.  In fact, the admissible evidence that Hospice has offered rebuts

8    any generic circumstantial evidence Lianoz has offered.  Jernigan testified that she did counsel

9    other employees during her tenure as IDON.  *Id.* at 75:4-22 ("wrote up" more than one but less

10   than five employees in addition to Lianoz).  Hospice also offers evidence that Ness, the female

11   HHA involved in catheter incident was counseled over the incident, just as Lianoz was.[5]  *See* Doc.

12   No. 70-4 (Supp. Burton Decl.) ¶ 4 & Ex. A (counseling Ness re catheter incident).  Ness was also

13   counseled after a mileage audit, just as Lianoz was.  *Id.* ¶ 5 & Ex. B (counseling Ness re mileage

14   audit).  Lianoz's bare assertion that other employees, specifically female employees, were

15   disciplined differently than he was therefore is not supported by the "specific, substantial

16   evidence" required to rebut Hospice's showing.  *See, e.g., Maxwell v. City and County of San*

17   *Francisco*, 2009 U.S. Dist. LEXIS 20907, *18 (N.D. Cal. Mar. 16, 2009) ("Plaintiff's speculation

18   that each act of discipline was motivated by race or sex discrimination does not constitute

19   'specific, substantial evidence' that Defendant's actions were pretextual").

20        Lianoz accordingly has not created a triable issue of fact whether similarly situated female

21   employees were disciplined differently regarding any specific incident.  As discussed *supra*,

22   however, Lianoz has offered evidence that he was counseled or written up more than any other

23   nurse at Hospice.  Whether the repeated counseling was warranted or was animated by

24   discriminatory intent is, again, a factual question that will have to be resolved by the trier of fact.

25

26

27          [5] The court notes that LVN Davidsen testified that she felt that Jernigan treated employees
28   fairly except that she held a grudge against two people: Ness and Lianoz.  Davidsen Dep. at 29:13-
     33:15. Ness is female; Lianoz is male.  *Id.*

United States District Court
Northern District of California

**B. Direct or Circumstantial Evidence Test**

A plaintiff alleging disparate treatment under Title VII need not engage in the *McDonnell Douglas* burden shifting test and may "simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the employer and that the employer's "actions adversely affected the plaintiff in some way." *McGinest*, 360 F3d at 1122; *see also Metoyer*, 504 F.3d at 930.

Lianoz contends that Jernigan's statement that she "did not like the idea of two male nurses" working together "clearly indicative of sexual stereotyping, *i.e.*, she engaged in the stereotype that men are less able as caretakers than women and thus a man should be paired with a woman in caretaking duties." Doc. No. 31 at 19. This, he argues, constitutes "direct evidence" of Jernigan's discriminatory reason for scrutinizing his performance, and eventually for terminating him, which adversely affected Lianoz. "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Godwin*, 150 F.3d at 1221; *see also Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir. 1991) ("the plaintiff need produce very little evidence of discriminatory motive to raise a genuine issue of fact"). Hospice disagrees, arguing that a single stray remark, which is isolated and unrelated to the decision process, cannot form the basis for a discrimination claim. Doc. No. 23 at 15. For the reasons discussed above, *see supra* at 13-15, Jernigan's single remark, while not substantial, is sufficient to raise a genuine issue of fact and defeat Hospice's motion for summary judgment.

## II. RETALIATION CLAIM

Claims for retaliation under Title VII are also analyzed under the *McDonnell Douglas* burden-shifting framework (*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002)). To establish a prima facie case of retaliation, the plaintiff alleging retaliation must establish that (1) he was engaged in protected activity; (2) his employer took an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action. *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1034-35 (9th Cir. 2006). Applying the *McDonnell Douglas* framework, an employer at Step Two may

1   offer evidence of a non-discriminatory motive, and at Step Three, the burden shifts again to the

2   employee to show that the reason is pretextual.

3           Lianoz offered evidence that he engaged in protected activity by refusing to comply with a

4   discriminatory request; that Jernigan's increased scrutiny, counseling and/or "writing up" of

5   Lianoz constituted a pattern of adverse employment action, culminating in his termination; and

6   that Jernigan engaged in this conduct in retaliation for Lianoz speaking up against her request.

7   While Lianoz has not offered much evidence, he has offered enough to create a triable issue of fact

8   as to each element of his prima facie retaliation case.  The analysis at Steps Two and Three of the

9   *McDonnell Douglas* framework as applied to Lianoz's retaliation claim is identical to the analysis

10  of his disparate treatment claim.  *See supra*.  Hospice has offered strong evidence that Jernigan did

11  not retaliate against Lianoz, but rather attempted to improve his performance and eventually

12  terminated him for legitimate reasons.  Lianoz, however, has offered sufficient evidence to create

13  a triable issue of fact at Step Three.  These factual disputes must be resolved by the fact finder.

14  The court must deny Hospice's motion for summary judgment on the retaliation claim for the

15  same reasons it denied summary judgment on the disparate treatment claim.

16                                  **CONCLUSION**

17          Plaintiff offered "very little" evidence that Jernigan waged a campaign of harassment

18  against him because he was male and refused to comply with her discriminatory request, and that

19  Jernigan made the request based on her own gender preferences and not on a patient's request; that

20  Jernigan subjected his actions to greater scrutiny than the actions of female nurses; and that

21  Jernigan eventually terminated him as a result of his refusal to comply with her request.  Hospice

22  argues that Lianoz was terminated because he repeatedly failed to comply with Hospice policies

23  and procedures, endangered patient safety, and harassed coworkers.  Plaintiff challenges the merits

24  of the myriad performance issues that Hospice has documented.  These are core factual disputes

25  that must be resolved by a jury.  The Ninth Circuit requires "very little evidence to survive

26  summary judgment in a discrimination case, because the ultimate question is one that can only be

27  resolved through a searching inquiry--one that is most appropriately conducted by the factfinder."

28  *Lam*, 40 F.3d at 1564; *see also Lowe*, 775 F.2d at 1008-09.  Lianoz has produced the "very little

United States District Court
Northern District of California

1    evidence" he needed to offer to create a triable issue of fact concerning Jernigan's motivation in

2    counseling and eventually terminating him.  Defendant's motion for summary judgment

3    accordingly is denied.

4            The parties are hereby referred to the court's ADR department, and ordered to complete

5    mediation in this matter no later than 45 days from the date of this order.  *See* Doc. No. 17

6    (Stipulation and Order).

7            The parties also shall appear for a further case management conference on Tuesday, July

8    29, 2014 at 2:00 p.m. in Courtroom 205, second floor, 514 H. Street, Eureka, California.

9

10           **IT IS SO ORDERED**.

11   Dated: July 23, 2014

12                                        _____

13                                        NANDOR J. VADAS
                                          United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

19